IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KVAERNER NORTH AMERICAN CONSTRUCTION
INC., as successor to Aker Kvaerner
Songer, Inc. and Aker Construction, Inc.,

        Plaintiffs,

v.                    //   CIVIL ACTION NO. 1:15CV210
                              (Judge Keeley)

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON SUBSCRIBING TO POLICY NO.
509/DL486507,

        Defendant.

MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]

Pending before the Court are cross motions for partial summary judgment filed by the plaintiff, Kvaerner North American Construction ("Kvaerner") (dkt. no. 100), and the defendant, Certain Underwriters at Lloyd's London Subscribing to Policy No. 509/DL486507 ("Excess Insurers")[1] (dkt. no. 102). For the reasons that follow, the Court **DENIES** Kvaerner's motion and **GRANTS** the motion of Excess Insurers.

## I. BACKGROUND

### A. The Project

The Longview Power Plant in Maidsville, West Virginia, is a $2 billion, 695-megawatt supercritical coal-fired power plant owned by

---

[1]The defendants note that they were incorrectly sued as Certain Underwriters at Lloyd's London Subscribing to Policy No. 509/DL486507 but are, in fact, "Aspen Insurance (UK) Ltd. ('Aspen') and Syndicate 2003 ('Caitlin')." They are collectively referred to here as the "Excess Insurers."

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

Longview Power, LLC ("Longview"). It was the first plant of its kind developed in the United States by an independent energy producer, and it was "the first greenfield coal-fired electric power generating plant constructed in the northeastern United States in over twenty years." Dkt. No. 97-25 at 3. Longview contracted with Kvaerner to construct the plant, with the exception of the cooling tower and main air discharge stack. Their agreement was memorialized in a January 26, 2007, Construction Services Agreement ("CSA"). Kvaerner self-performed some of the work and engaged subcontractors to perform other portions. In addition, Kvaerner was a consortium partner with Siemens Energy, Inc. ("Siemens"), which supplied additional services and equipment, and was the party responsible for constructing the cooling tower and air discharge stack construction that had been excluded from Kvaerner's scope of work.[2]

At the center of this litigation is the plant's boiler, a "first-of-its-kind supercritical pulverized coal-fired boiler." Id. at 4. Foster Wheeler North America Corporation ("Foster Wheeler") designed and supplied the boiler pursuant to a Boiler Island

---

[2]Siemens and Longview also entered into a separate "Turbine Island Supply Agreement," under which Siemens supplied the plant's turbine equipment for construction and installation by Kvaerner.

MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]

Equipment Agreement ("Boiler Agreement") with Longview. Longview later assigned the Foster Wheeler contract to the consortium to facilitate the boiler's installation by Kvaerner. In addition, because Foster Wheeler was supplying the boiler to Longview for installation by the consortium, more specifically by Kvaerner, Longview, Siemens, and Kvaerner all entered into a Coordination Agreement to control coordination and cooperation of the parties under their various contracts. Of particular importance here, the Coordination Agreement between Longview and Kvaerner contained a liquidated damages clause, obligating the consortium to pay $275,000 per day for every day the plant remained unfinished beyond the predetermined "substantial completion date," which the parties agreed would be March 12, 2011.

**B.   Boiler Problems**

Following Foster Wheeler's delivery of the boiler components to the project site, Kvaerner was tasked with its construction, part of which required Kvaerner to weld well over 10,000 tubes together in the "primary superheat and horizontal reheat areas" of the boiler. Both the primary superheat and horizontal reheat areas are composed of three banks of coils, consisting of 2" and 2.5" pipes arranged in a serpentine configuration. The tubes are

arranged in an evenly spaced pattern running horizontally, but the tube ends become vertical in the locations where adjacent coil bank tubes meet and align with one another. It is in these horizontal rows of vertically bent tube ends between each coil, also referred to as "weld-lines," that Kvaerner was tasked with welding the tube ends together to essentially create a closed-loop, continuous system.

Foster Wheeler fabricated the coil sections in its shop by forming the tubes into the necessary coils and welding metal "H-bars" to the tubes in certain locations to aid in properly aligning the tubes within each coil. This was vital to proper operation of the boiler, as the tubes must be in line with one another and cannot protrude into the "gas path" between the rows of tubes in the coils. Upon completion of their fabrication, Foster Wheeler delivered the coil sections to the project site, following which Kvaerner rigged, lifted, and set the components into place in the primary superheat and horizontal reheat areas of the boiler.

To perform the actual welds, however, Kvaerner subcontracted with Wachs Technical Services Ltd. ("Wachs"), which utilized an orbital welder to complete each of the required tube welds. Orbital welding involves clamping a welding machine at the intersection of

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

two tubes to be welded.  The machine then rotates around the two tubes, welding them together in an automated process. Wachs was responsible for welding six tubes at the bottom and top of each bank of 148 horizontal reheat coils, and eight individual tubes at the bottom and top of each bank of 148 primary superheat coils.

The primary superheat and horizontal reheat areas are very cramped, which made it difficult for workers and equipment to access the weld-lines. For ease of access, Wachs used come-alongs[3] to pull coils, or smaller groups of tubing within a coil, out of the way. By pulling coils and tubes out of the way, sometimes by several feet, Wachs was able to more easily complete its welds. It is undisputed that Wachs did not pull on the vertical portions of the tubes that it was actually welding to better align or assist in the weld itself; rather, Wachs pulled on the adjacent horizontal sections of the tubes to ease access to the weld-lines.

It was not until Wachs completed all of its welds and removed its equipment that Kvaerner and Foster Wheeler inspectors realized Wachs had significantly damaged the coils. The inspectors observed multiple H-bars that were bent or had fully broken off, as well as

---

[3]A come-along is a hand-operated, ratcheting winch capable of pulling up to several tons.

many tubes that were bent and out of alignment and significantly encroached into the gas path. After a detailed inspection of all of the coils, the inspectors concluded that Wachs had bent hundreds of H-bars and thousands of individual tubes.

## C.  Boiler Repairs

In June and July of 2010, Kvaerner, as a first effort to repair, attempted to realign the tubes by replacing the bent or broken H-bars in the hope that would forcibly realign the tubes. As the boiler designer, however, Foster Wheeler concluded that this repair effort did not adequately correct the damage and deemed the repair unacceptable. Kvaerner, this time working with Foster Wheeler, devised a plan to properly repair and return the boiler to acceptable condition. The plan required Kvaerner to identify every bent tube, cut the weld performed by Wachs on each of those tubes, mechanically bend the tubes back into proper alignment, and then re-weld the tubes.

In total, Kvaerner performed this process on thousands of tubes and completed the repairs in early November of 2010. The cost of the repairs ultimately exceeds $4.5 million. Moreover, as a consequence of the additional time required to complete the repairs, the project was delayed by 74 days.

## D. Arbitration

As a result of project delays, Longview concluded that it was contractually entitled to liquidated damages. It therefore withheld three milestone payments to Kvaerner, totaling $9,483,717, and drew down on Kvaerner's letter of credit in the amount of $26,542,627, a total of more than $36 million. Longview also withheld payments due to Siemens and drew down on its letter of credit in an amount exceeding $40 million.

On June 24, 2011, Kvaerner initiated a nearly four-year long arbitration involving itself, Longview, Siemens, and Foster Wheeler. In its answer to Kvaerner's demand for arbitration, Longview asserted, among other claims, liquidated damages of $76,450,000 against the consortium for an alleged 278-day delay. This claim included the 74 days attributable to the boiler tube and H-bar repairs, which totaled $20,350,000 in liquidated damages. Siemens asserted cross claims against Kvaerner, alleging that Kvaerner was responsible for much of the alleged delays. Siemens and Kvaerner ultimately resolved their dispute, with Kvaerner accepting responsibility for the 74-day delay related to tube repairs.

Ultimately, through a series of settlement agreements,

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

Kvaerner, Longview, and Siemens resolved their disputes as well, with Kvaerner accepting responsibility for, and suffering the loss of, $20,350,000 as a result of the liquidated damages attributable to the 74-day delay caused by Wachs.

**E.   Relevant Insurance Policies**

Relevant to the issues before the Court, the project was insured by a "wrap-up" commercial general liability insurance program ("CGL policy")) issued by Liberty Mutual Fire Insurance Company ("Liberty Mutual"). A "wrap-up" insurance program differs from a standard CGL policy in that it "place[s] many of the construction participants under one coverage program." Dkt. No. 100-1 at 14 (citing 4 Bruner & O'Connor on Construction Law § 11:569 (2016 ed.). Further, contrary to a typical CGL policy, the "wrap-up" program is limited to a particular project, in this case, the "Aker Kvaerner Songer Longview CCIP" in Maidsville, West Virginia. The Liberty Mutual CGL policy had limits of $2 million per occurrence and $4 million aggregate.

In addition, Kvaerner secured several policies to cover claims in excess of the CGL policy limits. The policy relevant to the issues at bar was underwritten by the Excess Insurers ("the Excess policy") and provided coverage of $25 million per occurrence in

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

excess of the primary CGL policy. Kvaerner was a named insured in both the CGL and excess policies. Further, both policies contain a choice of law provision, under which the parties agreed that New York law would control any dispute.[4]

In exchange for paid CGL premiums, the CGL policy agreed to "pay those sums that the [Kvaerner] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Dkt. No. 97-41 at 10. Under the CGL policy, the insurance coverage applied only to "bodily injury" or "property damage" caused by an "occurrence" in the "coverage area" during the policy period.[5] Id. It defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 22. It defines property damages as:

> a.  Physical injury to tangible property,
>     including all resulting loss of use of that

---

[4]The parties cite to numerous cases applying the law of states other than New York, but those cases simply have no bearing on coverage under New York law.  Moreover, because they often conflict with one another, they confuse rather than guide on the issues presented here. Accordingly, the Court has relied only on New York law to inform its decision.

[5]There is no dispute between the parties that the "coverage area" and "policy period" requirements are satisfied in this case and no further discussion of those issues is necessary.

> property. All such loss of use shall be deemed
> to occur at the time of the physical injury
> that caused it; or
>
> b.    Loss of use of tangible property that is not
>       physically injured. All such loss of use shall
>       be deemed to occur at the time of the
>       "occurrence" that caused it.

Id. at 22-23.

Following discovery of the boiler tube damage, Kvaerner submitted claims to both Liberty Mutual and the Excess Insurers. On multiple occasions during the course of the arbitration, Kvaerner provided further information to both insurers, including "Statements of Claims" provided by Longview and Foster Wheeler. Ultimately, both Liberty Mutual and the Excess Insurers denied coverage by letters dated April 16, 2013, and May 28, 2013, respectively.

**F.    The Instant Civil Action**

Kvaerner sued Liberty Mutual in the Circuit Court of Monongalia County, West Virginia. Liberty Mutual removed the case to this Court based on diversity jurisdiction. Kvaerner then amended its complaint to add the Excess Insurers as a defendant. The amended complaint asserted claims against Liberty Mutual for breach of contract for failure to defend, breach of contract for failure to indemnify, first party common law bad faith, and first

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

party statutory bad faith. It asserted two claims against the Excess Insurers for breach of contract for failure to indemnify and first party common law bad faith.

The Excess Insurers answered the complaint and also filed a counterclaim for declaratory judgment, seeking a declaration by the Court that they have no duty to indemnify Kvaerner. Later they amended their answer to add the defenses of "Lack of Exhaustion of Other Insurance" and "Accord and Satisfaction/Setoff."

The Excess Insurers contended that Kvaerner was seeking indemnification for the liquidated damages under several other policies, which could affect Kvaerner's ability to reach the excess policy and, to the extent Kvaerner would recover any portion of the liquidated damages from those other policies, the Excess Insurers would be entitled to a setoff.[6] In addition to their original claim for declaratory relief, the Express Insurers amended the counterclaim to seek an accounting of all other insurance recoveries related to the delay damages. For its part, Kvaerner

---

[6]The Excess Insurers noted three other insurers with which Kvaerner had filed claims relating to the project: Allianz Global Risks US Insurance Co. ("Allianz"), Zurich Insurance plc Norway Branch, and If Skadesforsikring. Of particular interest is the claim with Allianz, which, according to Kvaerner, is the subject of litigation in the Western District of Pennsylvania involving the same delay related damages at issue in this case.

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

denied that the delay damages it sought in litigation against Allianz overlapped with the delay damages sought in this litigation.

During the scheduling conference in the case, the Court bifurcated the issues of the duty to defend and the duty to indemnify from the bad faith claims. Later, during a status conference, the Court also bifurcated the quantum of damages and the duty to indemnify issues. Kvaerner later stipulated to the dismissal with prejudice of all claims against Liberty Mutual, leaving only the Excess Insurers as defendants in this action.

**G.    The Parties' Cross Motions for Partial Summary Judgment**

In its motion for partial summary judgment on the coverage question, Kvaerner argues that: "(1) [it] has exhausted the limits of the primary policy issued by Liberty Mutual . . . , and can therefore proceed to recover from the Excess [Insurers] under the Excess Policy; (2) the damages for which [it] seeks indemnification are covered by the Excess Policy; and (3) the damage caused by [its] subcontractor, Wachs Technical Services, Ltd., constitutes 'property damage' caused by an 'occurrence' . . . pursuant to the terms of the Excess Policy." Dkt. No. 100 at 1.

Conversely, the Excess Insurers contend that they are entitled

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

to summary judgment because the liquidated damages provision of the Coordination Agreement is unenforceable and Kvaerner has already been paid by other sources for all the damages alleged in its complaint. More importantly, they argue that there is no coverage under the policy because liquidated damages do not constitute an "occurrence" or "property damage" as those terms are defined in the policy. Moreover, even if there had been an occurrence and property damages implicating coverage, the Excess Insurers assert that several policy exclusions operate to deny coverage.

## II. LEGAL STANDARD

### A.    Summary Judgment Standard

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c)(1)(A). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or

determining its truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. <u>Id.</u> at 248–52.

## B.  Insurance Policy Interpretation

When interpreting insurance policies, courts must first determine whether the policy's relevant language is unambiguous. <u>See</u> <u>Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.</u>, 595 F.3d 458, 465 (2nd Cir. 2010). If so, the language should be given its "plain and ordinary meaning." <u>Gilbane Building Co./TDX Const. Corp. v. St. Paul Fire & Marine Ins. Co.</u>, 143 A.D.3d 146, 151 (N.Y. App.

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

Div. 2016). The court may then "construe [the policy] as a matter of law and grant summary judgment accordingly." Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006) (internal quotation marks and citation omitted). Importantly, insurance policies are subject to the normal rules of contract, see Universal American Corp. v. National Union Fire Ins. Co., 37 N.E.3d 78, 80 (N.Y. 2015), and the relevant coverage must be within the contemplation of the parties. See Brody Truck Rental, Inc. v. Country Wide Ins. Co., 277 A.D.2d 125, 126 (N.Y.A.D. 1 Dept. 2000) (noting that recovery of a particular type of damages must be within the contemplation of the parties).

Insurance coverage analysis follows a three step process: "(1) Were the damages caused by an occurrence? (2) Were the damages the result of property damage resulting from the occurrence? and (3) Are the damages excluded under one or more of the policy exclusions?" W. Schwartzkopf, Practical Guide to Construction Contract Surety Claims § 22.03 (2d Ed. 2016). The insured bears the initial burden of establishing that its claim is covered under the policy. If the insured proves an "occurrence" during the policy period as defined by the policy, the analysis then turns to whether there was damage to a third party's property. See ER. Squibb &

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154. 164-65 (2d Cir. 2001);

Reliance Ins. Co. v. Keystone Shipping Co.,102 F. Supp. 2d 181, 195

(S.D.N.Y. 2000) (noting that various insurance coverages that

require an "occurrence," including CGL policies, "all indemnify the

assured for damage he inflicts on third parties' property; none

offer indemnity for first party property damage"). Only if coverage

is triggered by an occurrence causing third-party property damage

does the burden shift to the insurer to establish that a coverage

exclusion operates to deny coverage. See Gaetan v. Firemen's Ins.

Co., 264 A.D.2d 806, 808 (N.Y. App. Div. 1999).

### III. DISCUSSION[7]

Several of the parties' arguments may be easily disposed of at

the outset. Kvaerner's contention that it has exhausted the limits

of the underlying Liberty Mutual policy is uncontested by the

Excess Insurers and the Court need not discuss it further.

Furthermore, the Excess Insurers' argument relating to whether, or

to what extent, Kvaerner may have already recovered some or all of

its liquidated damages during the arbitration also is of no

consequence here. The Court has bifurcated the question of damages

---

[7]Unless otherwise explicitly noted, all federal court
decisions cited in this section apply New York law.

MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]

from the question of coverage and indemnification.[8] Next, although the Excess Insurers argue that the liquidated damages provision of the Coordination Agreement is unenforceable, given their declination of coverage, they have waived the right to argue the validity of, or assert belated defenses to, the underlying claims between Longview and Kvaerner.[9] Accordingly, the Court need not address that argument further.

The remaining dispositive questions presented are whether the liquidated damages resulted from an "occurrence" as defined by the policy, whether liquidated damages constitute "property damage," whether the damage was to Kvaerner's own work, and whether any of the policy exclusions operate to deny coverage. For the reasons that follow, the Court concludes that there was no occurrence that

---

[8]Moreover, because, as the Court concludes, there is no coverage for liquidated damages, the quantum question is moot or, at the very least, is not ripe for summary judgment.

[9]See Martin v. Safeco Ins. Co. of America, 2004 WL 225486, at *3 (N.Y.Sup. 2004) ("An 'insurer with a duty to defend which refuses to do so is bound by the court's determination of the underlying action and cannot thereafter collaterally attack the judgment or raise defenses with respect to the merits'". (quoting Ramos v. National Casualty Company, 227 A.D.2d 250 (N.Y. App. Div. 1996); Matychak v. Sec. Mut. Ins. Co., 581 N.Y.S.2d 453, 455 (N.Y. App. Div. 1992) (noting that, having denied coverage, the insurer "assumed the risk" of a judgment against its insured and "may not now . . . go behind the underlying . . . judgment . . . to raise defenses extending to the merits of [the insured's] claim").

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

triggered coverage under the CGL and excess policies, liquidated damages are not property damage as contemplated by the CGL and excess policies, and there was no third-party damage because the damage caused by Wachs was part of Kvaerner's own work.[10]

**A.    There was no Occurrence Triggering Coverage**

The parties dispute whether there was an "occurrence" required to trigger coverage under the policy. An occurrence is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Dkt. No. 97-41 at 22. For insurance policies that base coverage on an "accident" or "occurrence," under New York law "the requirement of a fortuitous loss is a necessary element." Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co., 774 N.E.2d 687, 692 (N.Y. 2002); see also N.Y. Insurance Law § 1101(a)(1) (McKinney 2017) (noting that insurance is "dependent upon the happening of a fortuitous event"). New York defines a "fortuitous event" as "any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either

---

[10]Because the Court finds three independent grounds for its conclusion that liquidated damages are not covered losses under the CGL policy, it need not reach the question of whether any of that policy's exclusions would operate to deny coverage.

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

party." N.Y. Insurance Law § 1101(a)(2) (McKinney 2017). Moreover, the common definition of an accident is "'an event or condition occurring by chance or arising from unknown or remote causes,'" usually involving "an external force of some kind." <u>Jakobson Shipyard, Inc. v. Aetna Cas. and Sur. Co.</u>, 961 F.2d 387, 389 (2nd Cir. 1992) (quoting <u>Webster's Third New International Dictionary</u> 11 (1981)).

"New York courts have construed the term 'fortuitous event' to mean an event 'happening by chance or accident.'" <u>40 Gardenville, LLC v. Travelers Property Cas. of America</u>, 387 F.Supp.2d 205, 211 (W.D.N.Y. 2005) (quoting <u>80 Broad St. Co. v. United States Fire Ins. Co.</u>, 389 N.Y.S.2d 214, 215 (1975)). Fortuitous losses do not include "inherent defect[s], ordinary wear and tear, or intentional misconduct of the insured." <u>Int'l Multifoods Corp. v. Commercial Union Ins. Co.</u>, 309 F.3d 76, 83 (2nd Cir. 2002) (quoting <u>Ingersoll Milling Machine Co. v. M/V Bodena</u>, 829 F.2d 293, 307–08 (2d Cir. 1987), <u>cert. denied</u>, 484 U.S. 1042 (1988)). Under the fortuity doctrine, however, losses that the insured "knows of, planned, intended, or is aware are substantially certain to occur," are not covered losses. <u>40 Gardenville</u>, 387 F.Supp.2d at 211 (quoting <u>Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Companies, Inc.</u>,

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

265 F.3d 97, 106 (2d Cir. 2001); <u>see also</u> <u>Consol. Edison Co. of
N.Y. v. Allstate Ins. Co.</u>, 774 N.E.2d 687, 692 (N.Y. 2002) (noting
that CGL policies "implicitly exclude coverage for intended or
expected harms").

Furthermore, under New York law, where an insured's faulty
construction causes damage to its own work, there is no occurrence
triggering coverage for the insured's work. <u>George A. Fuller Co. v.
U.S. Fidelity and Guar. Co.</u>, 200 A.D.2d 255, 261 (N.Y.A.D. 1 Dept.
1994). However, there may be an occurrence triggering coverage when
there is damage to third-party property resulting from the
insured's faulty construction, including where the insured's
property is also damaged. <u>See, e.g.</u>, <u>I.J. White Corp. v. Columbia
Cas. Co.</u>, 105 A.D.3d 531, 532 (N.Y. App. Div. 2013) (recognizing
coverage under a CGL policy for a third-party's property damage
caused by the insured's faulty workmanship); <u>Royal Insurance Co. v.
Ru-Val Electric Corp.</u>, 1996 WL 107512, at *2-3 (E.D.N.Y. Mar. 8,
1996) (finding that electrical contractor had coverage for fire
damage to home caused by faulty wiring but not for replacement
costs of the electrical contractor's faulty wiring itself).

To be clear, under the facts in this case, Wachs caused damage
only to the H-bars and horizontal tubing of the coil sections. The

MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]

coil sections were components of the boiler that Wachs neither made
nor supplied; rather, they were component pieces of the boiler
fabricated by Foster Wheeler off-site and delivered to the project.
Wachs's work was limited solely to welding the vertical pipes on
adjoining coil sections following installation by Kvaerner in the
boiler structure. To aid in performing its contractual obligations,
Wachs pulled the adjacent piping to provide easier access to the
weld lines; in the process, it bent that piping, and bent or fully
dislodged the H-bars.

Kvaerner contends that, "[b]ecause Wachs' use of excessive
force to move the tubes was neither intended nor expected, it
constitutes an accidental 'occurrence' for which coverage is
appropriate . . . ." Dkt. No. 100-1 at 26. What Kvaerner misses,
however, is that the amount of force exerted by Wachs was not
unexpected or unintended, nor was it excessive for what it was
intended to accomplish. Indeed, Wachs exerted exactly enough force
to move the pipes as far as it desired in order to ease access to
each weld line.

Although Kvaerner does not explicitly frame it as such, it
could argue that, even if Wachs's actions were intentional, the
outcome, permanently bending the pipes and bending or breaking the

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

H-bars, was unintended and unexpected and the damage therefore an accident. See, e.g., <u>Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co.</u>, 774 N.E.2d 687, 692, (N.Y. 2002) (finding that a jury instruction stating that there "can be accidental results of intentional acts, thus, the term 'accident' or, in this case, 'occurrence' might apply even where the resulting damage was unintended, even though the acts that caused the damage were, in fact, intentional"). Nevertheless, Wachs's actions, and the resulting damage, were not "to a substantial extent beyond [its] control . . . ." N.Y. Insurance Law § 1101(a)(2) (McKinney 2017).

In addition, the damage caused to the pipes and H-bars likely falls under the fortuity doctrine's exclusion for losses the insured "knows of, planned, intended, or is aware are substantially certain to occur." <u>40 Gardenville</u>, 387 F.Supp.2d at 211. Kvaerner could reasonably argue that the first time Wachs spread apart the pipes for access the resulting damage was an accidental outcome. A review of the photographs reveals that, at the very least, it is quite apparent to the naked eye that the H-bars were significantly bent or had completely broken off, often falling away from their

original position.[11] <u>See</u> Exhibits 4, 5, 6, and 7 to Dkt. No. 97 (containing dozens of photographs of damage). This process was repeated hundreds of times over the course of several months by trained professionals employed by Wachs, under the direct control and supervision of additional trained professionals employed by Kvaerner. It lacks credulity to argue that neither Wachs nor Kvaerner knew that this damage was occurring, or was substantially certain to occur, after the first time, or at most, the first few times Wachs performed this process. Were this the Court's only consideration, at a bare minimum, material questions of fact, such as what and when Wachs or Kvaerner knew about this damage, would preclude summary judgment.

Those factual questions notwithstanding, the actions taken by Wachs were intentional and certainly not "beyond its control." N.Y. Insurance Law § 1101(a)(2) (McKinney 2017). Further, there were none of the hallmarks that New York courts have found to define an accident — a chance occurrence, an unknown or remote cause, or an

---

[11]The same is also true of the pipes. Although not as obvious to the naked eye as the damaged H-bars, including those that fell from their original locations, the Wachs employees who released the tension on the pipe surely should have noticed that they did not move back into their original position. Nevertheless, they continued using this technique to provide easier access for their work.

unexpected external force. See Jakobson Shipyard, 961 F.2d at 389

(noting that "the common definition of an accident is "'an event or

condition occurring by chance or arising from unknown or remote

causes,'" usually involving "an external force of some kind"); 40

Gardenville, LLC, 387 F.Supp.2d at 211 ("New York courts have

construed the term 'fortuitous event' to mean an event 'happening

by chance or accident.'"). Consequently, there was no fortuitous

event and therefore no occurrence that would trigger coverage.[12]

---

[12]This issue presents an interesting conundrum that bears
mention, that is, whether and to what extent Kvaerner's delay
related liquidated damages are "beyond its control." N.Y. Insurance
Law § 1101(a)(2) (McKinney 2017). At times, the Excess Insurers
contend that the "occurrence" leading to the liquidated damages
claim is the actual delay itself, not the Wachs' damage. This
argument has some force.

Although the delay may have stemmed from the Wachs' damage,
the liquidated damages stem only from a delay in the completion of
the project. See Dkt. No. 97-30 at 12 (Coordination Agreement
noting that liquidated damages are calculated from the date of
substantial completion of the plant, not any particular portion of
the project). The amount of liquidated damages arguably was well
within Kvaerner's control.

More manpower, additional shifts, added equipment, or other
methods could have reduced or eliminated the ultimate delay, while
slow decision making, lack of manpower, materials, equipment, or
other causes could have increased the delay. Accordingly, the
delay, or certainly the amount of delay, was not beyond Kvaerner's
control or a "condition occurring by chance or arising from unknown
or remote causes." Jakobson Shipyard, 961 F.2d at 389.

Further, such damages would be difficult for an insurer to
evaluate, particularly when the amount of delay damages dictated by
the contract, may bear little to no relationship to the actual
amount of property damage. This adds additional support for the

MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]

## B.  Liquidated Damages are not Property Damage Under the Policy

Even if there was an occurrence that triggered coverage, liquidated damages still must fall under the CGL policy's property damage definition:

    a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.   Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Dkt. No. 97-41 at 22-23.

Specifically, Kvaerner argues that the 74 day delay in the plant's opening attributed to damage caused by Wachs falls within the "loss of use" portion of the property damage definition. On the other hand, the Excess Insurers contend that the liquidated damages are an economic loss not contemplated by the CGL policy, and they do not fall under the property damage definition.

Generally speaking, the "purpose of a commercial general liability policy . . . is to provide coverage for tort liability

_____

conclusion that liquidated damages do not constitute property damage as contemplated by the policy. See infra at Part III.B. for discussion on liquidated damages and whether they constitute property damage.

for physical damage to others and not for contractual liability of the insured for economic loss because the product . . . is not what the damaged [party] bargained for" Bonded Concrete, Inc. v. Transcontinental Ins. Co., 12 A.D.3d 761, 762 (N.Y.A.D. 3 Dept. 2004)(quoting Hartford Acc. & Indem. Co. v. Reale & Sons, 228 A.D.2d 935, 936 (N.Y. 1996)); see also George A. Fuller Co. v. U.S. Fidelity and Guar. Co., 200 A.D.2d 255, 259 (N.Y.A.D. 1 Dept. 1994) ("The [CGL] policy was never intended to provide contractual indemnification for economic loss to a contracting party because the work product contracted for is defectively produced."). Requiring an insurer to indemnify for an insured's defective work would place them in the position of a surety rather than an insurer. Transportation Ins. Co. v. AARK Const. Group, Ltd., 526 F.Supp.2d 350, 356 (E.D.N.Y. 2007) (citing Bonded Concrete, 12 A.D.3d at 762).

Kvaerner, however, does not cite a single case applying New York law in which the court concluded that liquidated damages are covered under a CGL policy. Indeed, it concedes that, "[f]or their part, New York courts do not appear to have considered whether LDs are covered as damages resulting from an occurrence." See Dkt. No. 100-1 at 22. While it is true that no New York court has

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

specifically addressed whether contractual liquidated damages are covered under a CGL policy, New York courts have addressed whether delay damages, economic damages, and loss of use damages are covered, and have found consistently that they are not.[13]

In the absence of any clear New York authority, Kvaerner relies on I.J. White Corp. v. Columbia Cas. Co., 105 A.D.3d 531 (N.Y.App.Div. 2013), to support its contention that liquidated damages are covered as a loss of use of damaged property. I.J. White Corp involved a cake supplier which purchased an allegedly

---

[13]See, e.g., AARK Const., 526 F.Supp.2d at 357 ("Thus, an 'occurrence' of property damage under a CGL policy cannot exist where a general contractor's "negligent acts only affect[ ] [the property owner's] economic interest in the building." (quoting Fuller, 200 A.D.2d at 259)); J.Z.G. Res., Inc. v. King, 987 F.2d 98, 103 (2d Cir. 1993) ("The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss . . . ."); Hartford Acc. & Indem. Co. v. A.P. Reale & Sons, Inc., 644 N.Y.S.2d 442, 443 (N.Y.A.D. 3 Dept. 1996) ("We note that . . . the purpose of a [CGL] policy [] is to provide coverage for tort liability for physical damage to others and not for contractual liability of the insured for economic loss . . . .); Monroe County v. Travelers Ins. Companies, 419 N.Y.S.2d 410, 413 (N.Y.Sup., 1979) ("Lost profits, delay and performance of extra work are not encompassed within the term property damage as that is defined in the policies. They constitute intangibles in contrast to the requirement in the policies of damage to tangible property."); but see, Ohio Cas. Ins. Co. v. Lewis & Clinch, Inc., 2014 WL 6078572, at *11 (N.D.N.Y. 2014) (finding that lost profits for operational business were covered as a loss of use due to property damage).

defective large spiral freezer system from the insured. The
freezer system malfunctioned, causing damage to the supplier's cake
products. The cake supplier claimed "that for eight months, it was
unable to use the $21 million facility it had constructed
specifically to house the equipment that it had bought from [I.J.
White]." Id. It sued I.J. White for $3.6 million. White, in turn,
sought indemnification from its insurer. Id. at 533. The New York
State Supreme Court Appellate Division concluded that the cake
supplier's "loss of use of the facility specifically built to house
the freezer is also covered under the policy, since 'property
damage' is defined to include '[l]oss of use of tangible property
that is not physically injured.'" Id. at 532.

The facts in I.J. White are distinguishable from those in this
case for two reasons. First, I.J. White involved an ongoing
commercial enterprise that had lost the ability to operate; the
question of contractual liquidated damages related to new
construction was never implicated. Second, despite the court's
conclusion that loss of use of the facility was covered, the
damages sought by the cake supplier did not include any delay
damages, liquidated damages, or even lost profit damages. Rather,
it sought "$1.7 million paid to White for the freezer, $1.2 million

in repair costs to render the freezer operational in accordance
with the contract specifications, and $700,000 in employee overtime
wages." Id. at 533 (Abdus-Salaam, J., dissenting).[14] See also Ohio
Cas. Ins. Co. v. Lewis & Clinch, Inc., 2014 WL 6078572, at *11
(N.D.N.Y. 2014) (noting while analyzing the I.J. White case that,
"[t]o be sure, damages for lost profits was not sought in that
case."). Thus, in I.J. White, there were no actual damages for loss
of use, thus making any discussion on loss of use dicta.

Ultimately, there is simply no binding authority supporting
Kvaerner's position that a contractual obligation to pay delay
related liquidated damages, even those resulting from property
damage, are covered under the loss of use provision of a CGL
policy. Moreover, although New York's highest court has not ruled
specifically on that issue, several lower court rulings are
persuasive.

For example, in Monroe County v. Travelers Ins. Companies, the
court held that nearly identical policy language defining property

---

[14]Kvaerner also cites to Mattiola Constr. Corp. v. Commercial
Union Ins. Co., 2002 WL 434296 (Pa. Comm. Pleas, Mar. 8, 2002).
There the court concluded that liquidated damages were covered as
a loss of use resulting from property damage. That case, however,
has no bearing on the analysis here, as it is the ruling of a
Pennsylvania County Court applying Pennsylvania law and is in no
way binding on this Court.

damage did not encompass losses for delay:

> Lost profits, **delay** and performance of extra work are not
> encompassed within the term property damage as that is
> defined in the policies. They constitute intangibles in
> contrast to the requirement in the policies of damage to
> tangible property.

419 N.Y.S.2d 410, 413 (N.Y.Sup. 1979). Kvaerner attempts to

distinguish <u>Monroe County</u> by arguing that the plaintiff there only

"sought recovery for lost profits and performance of additional

work" (dkt. no. 106 at 21). On the contrary, it is clear from the

court's opinion that the plaintiff's claims included damages for

"delay," which it concluded did not constitute property damage

under the CGL policy.

Further, numerous courts in New York distinguished between

liabilities stemming from torts, which are plainly covered under

CGL policies, and damages that are contractually based and economic

in nature, which generally are not covered:

> We note that this disposition is in accord with the
> purpose of a commercial general liability policy which is
> to provide coverage for tort liability for physical
> damage to others and not for contractual liability of the
> insured for economic loss because the product or
> completed work is not what the damaged person bargained
> for.

<u>Hartford Acc. & Indem. Co. v. A.P. Reale & Sons, Inc.</u>, 644 N.Y.S.2d

442, 443 (N.Y.A.D. 3 Dept. 1996). <u>See also</u> <u>Fuller</u>, 200 A.D.2d at

259 ("The policy was never intended to provide contractual

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

indemnification for economic loss to a contracting party because the work product contracted for is defectively produced.").

The liquidated damages claimed by Longview were purely contractual, as Kvaerner's liability for them stems solely from the Coordination Agreement. In addition, they are purely economic in nature, as recognized by Kvaerner's General Counsel, James Tedjeske:

> Q.  Just to make sure that I understand you correctly, the [liquidated damages] as to Longview were to represent the interest carrying charge to the owner, in other words, the cost of money?
>
> A.  The cost of money.
>
> Q.  So it's effectively an economic issue or an economic exposure, the time value of money?
>
> A.  That's correct. You know this was an independent power project. It was financed, heavily financed, and the banks wanted to be assured that in the event of a delay that the owner would have sufficient funds from some source to pay their interest carrying charge.

Dkt. No. 98-22 at 42.

Even had there been an occurrence of property damage, it would not change the nature of the liquidated damages as contractually based economic damages. See Fuller, 200 A.D.2d at 259-60 ("A contract default under a construction contract is not transformed into an 'accident, including continuous or repeated exposure to

substantially the same general harmful conditions' by the simple expedient of alleging negligent performance or negligent construction."); Monroe County, 419 N.Y.S.2d at 414 ("A complaint which plainly seeks to recover for the intangible loss of profits plus the cost factor of extra work and time is not converted to a property damage claim by the insured's insistence that it is linked to the Canal's collapse. For this reason, the County's argument that per chance the economic damages alleged are merely consequential damages resulting from the direct damage to the Canal and that the court should infer property damage does not withstand scrutiny.").

A conclusion that delay-related liquidated damages are not contemplated under a CGL policy is in keeping with the general understanding of the nature of CGL and other forms of insurance under New York law:

> On certain types of projects, some risks are more likely to arise than others or the magnitude of a potential loss might be larger than usual. For example, road construction regularly encounters environmental obstacles, or the delayed completion of a power plant could cost a utility millions in lost revenue. Special coverages have been designed to transfer these recurring or heightened risks to a carrier. Owners and contractors need to inquire about the scope and price so coverage cost and benefit can be analyzed early on.

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

All construction projects are exposed to the risk of delayed completion. Whatever the reason for the delay, someone will have to cover the cost. Loss of revenue, loss of investment income, and continued debt servicing are just some of the financial ramifications. The insurance product traditionally used to mitigate delayed completion risks has been a consequential loss (soft cost) endorsement to the builder's risk policy. However, this will cover only the cost of delay where the cause is an insured peril under the builder's risk policy (typically limited to on-site physical damage) and usually not nonphysical or financial perils, i.e., economic loss damages. To bridge that gap, underwriters created these insurance solutions to what many companies had considered uninsurable risks:

- Delayed completion/liquidated damages coverage insures an owner (delayed completion) or a contractor (liquidated damages) against financial loss from a delay in project completion attributable to specified causes, such as failure of a party to perform timely.

. . .

New York Construction Law Manual § 10:14, Special Insurance Coverages (2d ed.). Furthermore, there is no evidence that the parties, certainly not the Excess Insurers, contemplated coverage for delay-related liquidated damages, which would preclude any recovery of such.[15]

---

[15]See, e.g., Brody Truck Rental, Inc. v. Country Wide Insurance Co., 277 A.D.2d 125, 126 (N.Y.A.D. 1st Dep't 2000) (granting insurer's summary judgment motion where liability policy at issue "contains no provision or language indicating that recovery of consequential damages was within the contemplation of the parties . . . and no factual issue has been otherwise raised as to whether

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

Finally, according to Kvaerner, "[t]he Excess Underwriters claim in passing and without citing any law that Kvaerner cannot recover loss of use damages because the physical damage to the H-bars and tubes occurred during the course of construction." Kvaerner counters this contention by citing to language in the CGL policy "stat[ing] that 'loss of use shall be deemed to occur at the time of the physical injury that caused it' in cases where the physically injured property is itself rendered inoperable, or 'at the time of the "occurrence" that caused it' in cases where tangible property, other than the property physically injured, is unavailable for use." Dkt. No. 106 at 19, n. 6 (quoting Policy's definition of property damage (dkt. no. 97-41 at 22-23)).

This language actually undercuts Kvaerner's argument. If the loss of use is deemed to occur either at the time of the physical injury, or at the time of the "occurrence" that causes the

the parties intended that [the insured] would be able to recover damages due to lost business and/or profits"); <u>Martin v. Metropolitan Property & Casualty Insurance Co.</u>, 238 A.D.2d 389, 390 (N.Y.A.D. 2d Dep't 1997) (granting motion to dismiss claim for consequential damages arising out of breach of "loss of use" provision of property insurance policy where "it was neither foreseeable nor within the contemplation of the parties at the time of the contract that failure to pay loss of use benefits would result in foreclosure and the consequential damages flowing therefrom. Nor does the contract of insurance contain any language which permits recovery for consequential damages.")

undamaged property to become unavailable, then the loss of use here would be the moment that Wachs' welders damaged the tubes and H-bars. Following that logic, the plant was not in use at that time and therefore there could be no actual loss of use. Indeed, this appears to argue against any coverage for liquidated damages imposed months or years later when the project is delayed beyond the substantial completion date.

In the end, New York has never recognized delay-related liquidated damages as covered property damage under a CGL policy containing language similar to the policy language in this case. On the other hand, there is support for the conclusion that contractually based delay damages are no more than consequential or economic losses not covered under a CGL policy. See, e.g., Monroe County, 419 N.Y.S.2d 410 (1979); Structural Building Products Corp. v Business Ins. Agency Inc., 722 N.Y.S.2d 559 (2001). Consequently, the Court declines to extend the CGL policy's coverage to damages previously unrecognized by New York courts, and concludes that liquidated damages do not constitute a covered loss under the CGL policy.

**C.    There Was no Property Damage Because the Damage Caused by
       Wachs was to Kvaerner's Work**

New York courts are abundantly clear that CGL policies insure for damage to third-party property, not damage to the insured's own

35

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

work product. See <u>AARK Const.</u>, 526 F.Supp.2d 350, 356-57 (E.D.N.Y. 2007) ("It has been well-settled by the New York courts that a CGL policy does not insure against faulty workmanship in the work product itself but rather faulty workmanship in the work product which creates a legal liability by causing bodily injury or property damage to something other than the work product."); <u>Bonded Concrete</u>, 12 A.D.3d at 762 (N.Y.A.D. 3 Dept. 2004) (noting that claim for property damage must fail in absence of property damage to anything other than insured's own work product).

The Excess Insurers maintain that, as the general contractor, Kvaerner's scope of work included the boiler and any damage to it, even if caused by its subcontractor, Wachs. Therefore, such damage would be to its own work and not an occurrence of property damage covered by the CGL policy. See <u>Pavarini Const. Co., Inc. v. Continental Ins. Co.</u>, 304 A.D.2d 501, 502 (N.Y.A.D. 1 Dept. 2003) ("As general contractor, Pavarini was responsible for the entire project and all work done by Pavarini's subcontractor was done on Pavarini's behalf."(citation omitted)).

Kvaerner contends that the boiler was not its work, but rather work supplied by Foster Wheeler and owned by Longview. Thus, it argues that, because the damage was not to the actual work Kvaerner performed — the Wachs welding — it was covered third-party property

MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]

damage. Consequently, because the liquidated damages were a result of that third-party property damage, Kvaerner contends that they too were covered. The Excess Insurers counter that the boiler was under the control and care of Kvaerner as part of the parties' CSA. See Dkt. No. 107 at 4-5. In support, they cite to the CSA's risk of loss provision:

> Risk of Loss. Despite the passage of title as set forth in Section 8.1, Constructor shall bear risk of loss and care, custody and control pertaining thereto of any materials, Constructor Equipment . . . or any other Constructor Work completed until the date of Substantial Completion . . . .

Dkt. No. 97-27 at 7. As Kvaerner correctly points out, however, the definition of Constructor Equipment specifically excludes the boiler:

> "Constructor Equipment" shall mean all of the machinery, equipment components, materials, apparatus, structures, supplies, special tools and other goods required by the terms of this Agreement to be provided by Constructor and each Subcontractor in connection with the performance of the Constructor Work (except that the term "Constructor Equipment" shall not include . . . (b) the Boiler Island Equipment . . . ).

Dkt. No. 97-26 at 7-8.

Recognizing that its responsibility for, or ownership of, the boiler dooms its claim of third-party property damage, Kvaerner goes to great lengths to disclaim any such responsibility or ownership. The agreements between the parties belie Kvaerner's

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

contention, however, and establish that Kvaerner was contractually obligated to deliver a functioning plant. More specifically, the CSA provided that

> [Kvaerner] shall provide design services applicable to the Constructor Work, supply the Constructor Equipment, **install** all Turbine Island Equipment**, Boiler Island Equipment** and Constructor Equipment **and construct the Plant** in accordance with Appendix I and in a good, workmanlike and quality manner, with all reasonable care, skill and diligence such that the Plant will be:
> . . .
> (e) sufficient, complete and adequate in all respects necessary to enable the Plant to achieve Substantial Completion by the Guaranteed Substantial Completion Date
> . . . .

Dkt. No. 97-26 at 11-12 (emphasis added). Thus, it is clear that, as with the general contractor in <u>Fuller</u>, Kvaerner was responsible for delivering a completed, properly functioning plant — including the boiler. <u>See</u> <u>Fuller</u>, 200 A.D.2d at 260 (noting that, because "Fuller's contract with Epurio required it, as a general contractor and construction manager on the project, to provide a completed building," damage to its own work included all work by subcontractors and suppliers).

Kvaerner argues with force that Foster Wheeler performed the work of fabricating the boiler components, and that the boiler was owned by Longview, thereby removing it from the scope of Kvaerner's work, control, or ownership; Kvaerner simply put the pieces together. That is a gross simplification of their responsibility

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

under the CSA, which clearly states that Kvaerner was to "install . . . [the] Boiler Island Equipment . . . and construct the Plant . . . in a good, workmanlike and quality manner, with all reasonable care, skill and diligence such that the Plant will be . . . . sufficient, complete and adequate in all respects . . . ." Dkt. No. 97-26 at 11-12. In light of this contract language, there is no merit to Kvaerner's argument that its scope of work somehow did not include the care and proper installation of the boiler components, regardless of who manufactured them, as part of its contractual obligation to provide a fully functioning boiler as a whole.

Additional language from the Coordination Agreement further supports the conclusion that Kvaerner was responsible for the boiler as a whole. For example, Section 8.1 of the Coordination Agreement provides:

> Owner has entered into the Boiler Contract for the procurement of the Boiler Island Equipment contemporaneously with this Agreement. To facilitate the coordinated design and construction of the Plant, of which the Boiler Island Equipment is a significant part, [Siemens and Kvaerner] have agreed . . . that the Work of [Kvaerner] shall include [Kvaerner] acting as Owner's agent in connection with the installation of the Boiler Island Equipment and the Boiler Contract ("installation Agent"). Owner hereby appoints [Siemens and Kvaerner] to be its Design Agent and Installation Agent, respectively, with respect to the Boiler Contract . . . . Except as set forth in Section 8.7 hereof, as Installation Agent, [Kvaerner] **shall be responsible for the timely and proper**

> **installation and erection of all Boiler Island Equipment
> in order to achieve Substantial Completion** by the
> Guaranteed Substantial Completion Date and Final
> Completion by the Date Certain. . . . Except as set forth
> in Section 8.7, Constructor and Turbine Island Supplier
> **shall be responsible for all other requirements of the
> Boiler Island Equipment as an integral part of the Plant
> under the Longview Contracts.**

Dkt. No. 97-30 at 21 (emphasis added).

The clear language of the Coordination Agreement also dooms
Kvaerner's argument that, because Longview owned the boiler, the
Wachs damage was to third-party property. In Section 8.2 of the
Coordination Agreement, Longview assigned the Boiler Agreement to
Kvaerner:

> Owner expressly **assigns and delegates to [Kvaerner and
> Siemens] all rights and obligations of the Owner under
> the Boiler Contract** including the rights to approve or
> disapprove any design drawings and changes thereto, to
> request or approve or disapprove any change orders, to
> inspect the Boiler Island Equipment and observe any
> factory tests and **to exercise the rights and remedies of
> Owner with respect to the Boiler Contract**, including the
> right to make demand under any letter(s) of credit
> provided thereunder and any other security provided by
> Boiler Island Supplier under the Boiler Contract and
> initiate, prosecute and/or defend any arbitration or
> legal proceedings against the Boiler Island Supplier. .
> . Owner agrees that any damages (including liquidated
> damages) recovered from Boiler Island Supplier shall be
> for the account of and paid jointly (without duplication)
> to [Kvaerner and Siemens]. . . . **In respect of the
> exercise of any right or remedy under the Boiler
> Contract, both [Kvaerner and Siemens] will be acting as
> if the Boiler Island Supplier were a Subcontractor to**

MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]

> [Siemens and Kvaerner], and because [Siemens and
> Kvaerner] have assumed all risks under the Boiler
> Contract . . . , [Siemens and Kvaerner] may, in enforcing
> the Boiler Contract, act in their Own best interests . .
> . .

Dkt. No. 97-30 at 22 (emphasis added). As assignee of the Boiler
Agreement, Kvaerner "'step[ped] into [Longview's] shoes and
acquire[d] whatever rights the latter had,' including the right to
enforce the contract." BSC Associates, LLC v. Leidos, Inc., 91
F.Supp.3d 319, 323 (N.D.N.Y. 2015) (quoting In re Stralem, 303
A.D.2d 120, 123, (N.Y.A.D. 2nd Dept. 2003)).

Based on this assignment, Kvaerner was the defacto owner of
the boiler. The contracts further establish that Kvaerner was in
control of the boiler as a whole and was responsible for its
construction and final turn-over to Longview in fully functioning
condition prior to the substantial completion date. Ultimately, the
entire plant was within the scope of Kvaerner's work. As such,
providing a properly installed, constructed, and functional boiler,
including all of its component parts, was clearly within Kvaerner's
scope of work. It cannot credibly be argued that damage by its
subcontractor to components of the boiler was somehow outside of
the scope of that work. Accordingly, the damage caused by Wachs'
welders was to Kvaerner's own work and therefore is not covered
under the CGL policy.

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 100] AND GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 102]**

### IV. CONCLUSION

For the reasons discussed, the Court concludes that 1) there was no occurrence triggering coverage; 2) the liquidated damages are not property damage losses under the CGL policy; and 3) the damage caused by Wachs was damage to Kvaerner's own work, which is not a covered loss under the policy. Accordingly, the Court **DENIES** Kvaerner's motion for partial summary judgment (dkt. no. 100) and **GRANTS** the Excess Insurers' motion of partial summary judgment (102). Further, although the cross motions were for partial summary judgment, the Court's ruling on the coverage issue disposes of the remainder of the case. Consequently, the Court **DISMISSES** Kvaerner's complaint **WITH PREJUDICE**, and **ORDERS** that this case be stricken from its active docket.

It is so **ORDERED**.

The Court directs the Clerk of Court to transmit copies of this Memorandum Opinion and Order to counsel of record and to enter a separate judgment order.

DATED: June 28, 2017

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE